# United States Court of Appeals for the Federal Circuit

---

**MICHAEL CONWAY, IN HIS CAPACITY AS LIQUIDATOR OF COLORADO HEALTH INSURANCE COOPERATIVE, INC.,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

---

2020-1292

---

Appeal from the United States Court of Federal Claims in No. 1:18-cv-01623-RAH, Judge Richard A. Hertling.

---

Decided: May 17, 2021

---

CLIFTON S. ELGARTEN, Crowell & Moring LLP, Washington, DC, argued for plaintiff-appellee. Also represented by CHARLES BAEK, SKYE MATHIESON, STEPHEN JOHN MCBRADY, MONICA ROSE STERLING, DANIEL WILLIAM WOLFF.

ALISA BETH KLEIN, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented by JEFFREY B. CLARK, JEFFREY ERIC SANDBERG.

---

Before MOORE, BRYSON, and CHEN, *Circuit Judges*.

MOORE, *Circuit Judge*.

The government appeals a final judgment of the United States Court of Federal Claims. J.A. 21; *see also Conway v. United States*, 145 Fed. Cl. 514 (2019) ("*Claims Court Op.*"). In 2016, a Colorado court ordered Colorado Health Insurance Cooperative, Inc., into liquidation. At the time, the government owed Colorado Health $24,489,799 for reinsurance debts under the Patient Protection and Affordable Care Act (ACA), Pub. L. No. 111-148, 124 Stat. 119 (2010), and related regulations. Colorado Health, on the other hand, owed the Department of Health and Human Services approximately $42,000,000 for risk adjustment debts, another program under the ACA and related regulations. The government attempted to leapfrog other insolvency creditors through offset, rather than paying its debt in full and making a claim against Colorado Health's estate as an insolvency creditor. The Claims Court, however, ordered the government to pay. For the following reasons, we affirm.

## BACKGROUND

In the ACA, Congress adopted "a series of interlocking reforms designed to expand coverage in the individual health insurance market." *King v. Burwell*, 576 U.S. 473, 478–79 (2015). As part of the ACA, Congress enacted three risk-mitigation programs, often called the "3Rs." 42 U.S.C. §§ 18061 (reinsurance), 18062 (risk corridors), 18063 (risk adjustment). In general, the 3Rs were aimed at stabilizing health insurance premiums. Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. 15,410, 15,411 (Mar. 11, 2013) (to be codified at 45 C.F.R. pts. 153, 155–58) ("*2014 Final Rule*").

Here, the risk adjustment and reinsurance programs are particularly relevant. The risk adjustment program, which is permanent, charges insurers of individuals who had below-average actuarial risk and pays insurers of individuals who had above-average actuarial risk. 42 U.S.C. § 18063(a). It "is intended to provide increased payments to health insurance issuers that attract higher-risk populations, such as those with chronic conditions, and reduce the incentives for issuers to avoid higher-risk enrollees." *2014 Final Rule*, 78 Fed. Reg. at 15,411. The reinsurance program, which only lasted three years, collected yearly payments from all insurers and made payments to insurers of particularly costly individuals that year. 42 U.S.C. § 18061. It "[wa]s designed to protect against issuers' potential perceived need to raise premiums due to the implementation of the 2014 market reform rules, specifically, guaranteed availability." *2014 Final Rule*, 78 Fed. Reg. at 15,467. Both programs operate on a state-by-state basis, and states are permitted to craft their own programs, provided the plans comply with federal standards. 42 U.S.C. § 18041(a)–(b). If states fail to act, however, the Department of Health and Human Services (HHS) must step in. *Id.* § 18041(c). In all but two states, HHS operates both programs.

To implement these programs, HHS has promulgated extensive regulations. *See, e.g.*, *2014 Final Rule*, 78 Fed. Reg. at 15,411–540. One such regulation, designed to ease HHS' administration of the 3Rs, allows for netting of payments:

> HHS may net payments owed to issuers and their affiliates operating under the same tax identification number against amounts due to the Federal or State governments from the issuers and their affiliates under the same taxpayer identification number for . . . risk adjustment [and] reinsurance . . . payments and charges.

45 C.F.R. § 156.1215(b) (the "Netting Regulation") (applicable after 2014). In promulgating the Netting Regulation, HHS explained that it was designed "to streamline payment and charge flows from all of these programs" and that HHS believed "this process w[ould] enable [it] to operate a monthly payment cycle that will be efficient for both issuers and HHS." Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2015, 79 Fed. Reg. 13,744, 13,817 (Mar. 11, 2014) ("*2015 Final Rule*").

The ACA also created a Consumer Operated and Oriented Plan (CO-OP) program "to foster the creation of qualified nonprofit health insurance issuers to offer qualified health plans in the individual and small group markets in the States in which the issuers are licensed to offer such plans." 42 U.S.C. § 18042(a)(2). That program provided loans and grants to persons "applying to become qualified nonprofit health insurance issuers." *Id.* § 18042(b)(1). In setting repayment terms for those loans, HHS is required to comply with state solvency law. *Id.* § 18042(b)(3).

Colorado Health, a CO-OP program insurer, participated in the Colorado reinsurance and risk-adjustment programs for benefit year 2015. Because Colorado had declined to administer those programs, HHS operated both. For that year, HHS owed Colorado Health $38,664,334.67 under the reinsurance program, and Colorado Health owed HHS approximately $42,000,000 under the risk-adjustment program. In early 2016, before the final obligations for benefit year 2015 were tabulated, HHS made an early reinsurance payment. Accounting for that payment, HHS still owes Colorado Health $24,489,799. No other payments have been made.

Soon after HHS' early payment, a Colorado court ordered Colorado Health into liquidation. Liquidation is a bankruptcy-like proceeding during which a liquidator, here Michael Conway, collects and distributes an insurer's

assets. In Colorado, such proceedings are governed by the Insurers' Rehabilitation and Liquidation Act. Colo. Rev. Stat. §§ 10-3-501 to 10-3-559; *see also* 1992 Colo. Legis. Serv. S.B. 92–12 (repealing and recodifying that Act in its entirety). The Act sets the priority for asset distribution. *See* Colo. Rev. Stat. § 10-3-541. For example, it prioritizes administrative expenses and policyholders over the federal government:

> **Class 1**. The costs and expenses of administration during rehabilitation and liquidation, including but not limited to the following: . . . .

> **Class 2**. All claims under policies [with various exceptions] . . . .

> **Class 3**. Claims of the federal government, except those described in [Class 2].

*Id.* § 10-3-541(a)–(c). It also creates exceptions to those priority rules. One such exception, added during the 1992 recodification, is offset:

> Notwithstanding any other provision of this title, mutual debts or mutual credits, whether arising out of one or more contracts between the insurer and another person in connection with any action or proceeding under this part 5, shall be set off, and the balance only shall be allowed or paid, except as provided in subsections (2) and (4) of this section and section 10-3-532.

*Id.* § 10-3-529(1) (as amended in 2001). This set off statute overruled, in part, *Bluewater Insurance Ltd. by Tennessee Insurance Co. v. Balzano by Colaiannia*, 823 P.2d 1365 (Colo. 1992) (holding no right to offset existed).

In response to Colorado Health's insolvency, HHS expressed an intent to offset Colorado Health's risk adjustment debt against HHS' reinsurance debt. After various proceedings in state court, Conway sued HHS in the

Claims Court, seeking direct payment of HHS' reinsurance debt. Before the government answered, Conway moved for summary judgment. The government opposed and filed a countermotion to dismiss.

The Claims Court granted-in-part and denied-in-part both motions. *See Claims Court Op.*, 145 Fed. Cl. at 518. As is relevant here, the Claims Court held "neither the ACA nor another statute require or authorize HHS to issue a rule offsetting among different ACA programs payments HHS owes to an insurer in liquidation proceedings and contributions HHS is owed." *Id.* at 522, 523–24. It also held that federal common law controlled the government's right to offset, rather than state law. *Id.* at 524. But the Claims Court recognized that existing federal law does not address offset during state-law insolvency proceedings. *Id.* And the Claims Court declined to create federal common law that would conflict with state law. *Id.* at 526–27. Interpreting Colorado's offset provision, the Claims Court held the government was not entitled to offset. *Id.* at 524–26. Thus, it entered judgment on the merits in Conway's favor. *Id.* at 530. The parties stipulated to the amount of damages, and the Claims Court entered final judgment. J.A. 21. The government appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

The government challenges the Claims Court's decision at every turn. It argues that Colorado law, as properly interpreted, affords it a right to offset ACA debts during insolvency proceedings. Thus, even if state rules of decision apply, the government seeks reversal. Moreover, federal law, the government contends, provides a right to offset ACA debts during insurer insolvency or at least forecloses the Claims Court's money judgment. Put simply, the government argues its ACA debts take priority over all other creditors' claims during Colorado insolvency

proceedings. Oral Arg.[1] at 8:42–9:23 (agreeing that the government argues that, "if a debt is owed under the ACA, then it trumps insolvency entirely"). We do not agree.

## A. Colorado Law

With respect to state law, the government reads Colo. Rev. Stat. § 10-3-529 as allowing offset of statutory obligations, not just contractual obligations. Alternatively, the government believes it is entitled to offset statutory obligations under Colorado common law.

## I. Statutory Law

Under Colorado law, "[o]ur primary duty in construing statutes is to give effect to the intent of the General Assembly, looking first to the statute's plain language." *Vigil v. Franklin*, 103 P.3d 322, 327 (Colo. 2004). When the statute is "clear and unambiguous on its face," we "need not look beyond the plain language." *Id.* "Words and phrases shall be read in context and construed according to the rules of grammar and common usage." Colo. Rev. Stat. § 2-4-101; *accord id.* Also, we must "presume that the legislature did not use language idly. Rather, the use of different terms signals the General Assembly's intent to afford those terms different meanings." *Bd. of Cty. Comm'rs of the Cnty. of Teller v. City of Woodland Park*, 333 P.3d 55, 58 (Colo. 2014) (citation omitted).

Section 10-3-529(1)'s plain language, which in part overturned *Bluewater*, allows offset of contractual obligations. In relevant part, that section requires that "mutual debts or mutual credits, whether arising out of one or more contracts . . . , be set off" during insurer insolvency proceedings. By its terms, the "one or more contracts" clause explains which "mutual debts or mutual credits . . . shall be

---

[1] Available at http://oralarguments.cafc.uscourts. gov/default.aspx?fl=20-1292_12092020.mp3.

set off." The Colorado offset provision is limited to offsetting debts and credits in contractual obligations. The "one or more contracts" clause lacks any broad, catchall language that would extend further. Thus, § 10-3-529(1)'s plain language requires offset for obligations "arising out of one or more contracts," but no other obligations.

The next subsection, which excludes certain obligations from § 10-3-529(1)'s purview, supports that interpretation. The General Assembly excluded only two specific categories of obligations:

> (e) The obligation of the person is to pay an assessment levied against the members or subscribers of the insurer, or is to pay a balance upon a subscription to the capital stock of the insurer, or is in any other way in the nature of a capital contribution; or

> (f) The obligations between the person and the insurer arise from business in which either the person or the insurer has assumed risks and obligations from the other party and then has ceded back to that party substantially the same risks and obligations; except that, with regard to such business, the commissioner has discretion to allow certain setoffs if the commissioner deems them appropriate.

*Id.* § 10-3-529(2)(e)–(f). Each category describes contractual obligations: obligations of owners or subscribers in subsection (e)[2] and obligations that allocate risk in

---

[2]    "Assessments" are an example of "consideration for [contracts of insurance]." *See* Colo. Rev. Stat. § 10-3-502(4) ("Doing business" includes . . . [c]ollecting premiums, membership fees, assessments, or other consideration for such contracts[.]"). Colorado courts may be able to order an assessment for "all members of the insurer who are subject to assessment," *id.* § 10-3-530, but the obligation to pay arises out of contract.

subsection (f).  In contrast, § 10-3-529(2) does not carve out any specific noncontractual obligations, supporting our reading of § 10-3-529(1).

The offset statute's effective date provision, § 10-3-529(6), further supports our interpretation of § 10-3-529:

> This section shall be effective January 1, 1993, and shall apply to all contracts entered into, renewed, extended, or amended on or after said date and to debts or credits arising from any business written or transactions occurring after January 1, 1993, pursuant to any contract including those in existence prior to January 1, 1993, and shall supersede any agreements or contractual provisions which might be construed to enlarge the setoff rights of any person under any contract with the insurer. For purposes of this section, any change in the terms of, or consideration for, any such contract shall be deemed an amendment.

It provides a detailed framework for determining when § 10-3-529 becomes effective for contractual obligations, considering various fact patterns.  But it is silent as to similar problems that would arise for noncontractual obligations.  By treating contractual obligations in such detail, the General Assembly conveys its sole focus on such obligations.

The government does not read the language of § 10-3-529(1) as limited to offsets "whether arising from one contract or arising from more than one contract."  Instead, the government suggests that the statute should be construed as if it allowed offsets "whether or not they arise out of contract."  But in recodifying the Insurers' Rehabilitation and Liquidation Act, the Colorado General Assembly used "whether . . . or not" extensively. *See, e.g.*, 1992 Colo. Legis. Serv. S.B. 92–12, §§ 10-3-516(1)(a) (using "whether or not"), 10-3-520(1)(u) (same).  By using "whether" rather than "whether . . . or not," the General Assembly created a

presumption that it intended different meanings.  *See Teller*, 333 P.3d at 59.  And nothing in the plain language of the statute or the broader statutory scheme rebuts the presumption.

After considering all relevant sources of authority, we hold that Colo. Rev. Stat. § 10-3-529(1) provides an offset right that is limited to contractual obligations.  Because the obligations here arise out of a statute, § 10-3-529 does not afford the government a right to offset.

## II.  Common Law

"[W]here the interaction of common law and statutory law is at issue, [Colorado courts] acknowledge and respect the [Colorado] General Assembly's authority to modify or abrogate common law, but can only recognize such changes when they are clearly expressed." *Vigil*, 103 P.3d at 327.  "A statute, general in its terms, is always to be taken as subject to the common law." *Id.* (internal quotation marks omitted).  But "when the legislature speaks with exactitude, [Colorado courts] must construe the statute to mean that the inclusion or specification of a particular set of conditions necessarily excludes others." *Id.*

The context of the statutory scheme suggests § 10-3-529 defines all permissible offsets during insurer insolvency.  As discussed above, that section is "specific in its terms and without ambiguity or qualification." *See Vigil*, 103 P.3d at 328.  And it was passed as part of a "comprehensive and exhaustive" statutory scheme. *See id.*; 1992 Colo. Legis. Serv. S.B. 92–12.  In that statutory scheme, the General Assembly included a detailed order for creditor priority.  Colo. Rev. Stat. § 10-3-541.  Allowing offset beyond the plain terms of § 10-3-529 would disrupt that priority order.  It would also render § 10-3-529 superfluous.  The common law right the government argues for would cover every obligation that must be offset under § 10-3-529, *i.e.*, contractual obligations, leaving the statute's language meaningless.  Because the statutory language is clear, our

inquiry begins and ends with the unambiguous statutory language. *Vigil*, 103 P.3d at 327.

The Colorado Supreme Court's closest case on point—*Bluewater*, 823 P.2d 1365—supports our conclusion. There, the Colorado Supreme Court held that Colorado's then-effective insolvency statutes "abrogate[d] any right of the reinsurer to offset unpaid premiums from the reinsurance proceeds due." *Id.* at 1366. The court reasoned that the Colorado General Assembly had passed a group of statutes changing "the very nature of the reinsurance contract," *id.* at 1372, rather than just overruling the Supreme Court's holding that reinsurance was a contract of indemnity, *see Fidelity & Deposit Co. v. Pink*, 302 U.S. 224 (1937). And the insurance commissioner gave sensible effect to those statutes by excluding an offset clause in the relevant reinsurance contracts. Deferring to the commissioner's interpretation, then, the court held that "the plain words of the [insurance] statutes abrogate the alleged [equitable] right to offset." *Bluewater*, 823 P.2d at 1373. Later, it also noted offset would create an impermissible preference for reinsurance creditors: "the relief prayed for by the reinsurers, predicated on the existence of an equitable right to offset, would favor their private interest over the interest of policyholders, contrary to law." *Id.* at 1374. In the same way, allowing the government to offset here would allow its interests to leapfrog policyholders' interests, and that would be contrary to the priority framework set out in § 10-3-541 and to the absence of non-contractual debts from § 10-3-529(1)'s scope. We see no basis in Colorado common law to adopt the sweeping offset provision advocated for by the government.

Therefore, because § 10-3-529 defines all permissible offsets under Colorado insolvency law, there is no equitable right to offset. Without such a right, the government cannot offset ACA obligations under Colorado common law.

### B.   Federal Law

Because Colorado law does not provide the government a right to offset, we consider federal law.  The government argues that debts arising under the federal regulatory scheme, *i.e.*, the ACA and HHS' regulations implementing the ACA, are not subject to Colorado insolvency law.  In the alternative, it relies on federal common law for a right to offset in state insolvency proceedings.  Finally, even if it cannot offset, the government argues a money judgment was inappropriate.  We take each contention in turn.

### I.   The Federal Scheme

The parties' dispute regarding the federal scheme has been a bit of a moving target.  Initially, the government focused on the validity and applicability of the Netting Regulation.  *See* Appellant Br. at 14–24.  Throughout the appeal, the government expanded its preemption position, arguing any debt owed to the government under the ACA is exempted from Colorado's priority statute.  Oral Arg. at 7:55–10:15.  The government argued that federal ACA debts are not subject to state insolvency law—they move to the front of the line of creditors.  Oral Arg. at 8:42–9:23 (agreeing that the government argues that, "if a debt is owed under the ACA, then it trumps insolvency entirely").  In the end, the parties present a question of preemption: whether the federal scheme preempts state law fixing creditors' rights during insolvency.

1

"Put simply, federal law preempts contrary state law." *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1297 (2016).   "Pre-emption fundamentally is a question of

congressional intent . . . ."[3] *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79 (1990). "To discern Congress' intent we examine the explicit statutory language and the structure and purpose of the statute." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990). Additionally, we must "respect not only what Congress wrote but, as importantly, what it didn't write." *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1900 (2019) (Gorsuch, J., announcing judgment and delivering an opinion). When Congress is "silen[t] on [an] issue," despite "its certain awareness of" that issue, that "is powerful evidence that Congress did not intend" preemption. *Wyeth v. Levine*, 555 U.S. 555, 575 (2009).

"[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt" state law. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Particularly when "Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (internal quotation marks and citations omitted).

---

[3]    Although the Supreme Court casts preemption in congressional terms, these statements apply with equal force to agency regulations. "Federal regulations have no less pre-emptive effect than federal statutes." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). The relevant questions are whether a regulation was intended to preempt state law and, if so, whether that regulation is within the scope of HHS' delegated authority. *Id.* Because the government has not shown that HHS had a "clear and manifest" intent to preempt state law fixing creditor priority during insolvency, we need not reach Conway's arguments regarding the latter question.

There are strong justifications for applying the presumption against preemption to insurer insolvency law. "[T]he regulation of 'insurance' . . . has traditionally been under the control of the States." *SEC v. Variable Annuity Life Ins. Co. of Am.*, 359 U.S. 65, 68–69 (1959) (citation omitted). And there is a "historic primacy of state regulation of matters of health and safety," which supports applying the presumption to health insurance regulations. *Medtronic*, 518 U.S. at 485. In fact, Congress has recognized the benefits of state regulation of insurance: "the continued regulation and taxation by the several States of the business of insurance is in the public interest." McCarran-Ferguson Act ch. 20, § 1, 59 Stat. 33, 33 (1945) (codified at 15 U.S.C. § 1011); *see also id.* § 2, 59 Stat. at 34 (codified as amended at 15 U.S.C. § 1012) (limiting federal preemption of state insurance law).

Thus, for federal law to control in state insurer insolvency proceedings, the government must overcome the presumption against preemption. To do so, it must identify a clear and manifest intent to preempt Colorado law that fixes creditors' rights during insolvency. But neither the ACA nor HHS' regulations implementing the ACA evidence such an intent.[4]

2

To begin our analysis of preemptive intent, we start with the ACA. First, we look to the statutory text, which

---

[4]    Conway argues that our preemption analysis is narrowed by the McCarran-Ferguson Act's nonpreemption provision, 15 U.S.C. § 1012, and the ACA's nonpreemption provision, 42 U.S.C. § 18041(d). Because we hold federal law does not preempt under the ordinary preemption framework, we need not address this argument. We do note, however, that Conway concedes the ACA relates to insurance. Appellee Br. at 17.

is silent regarding state insolvency law. *See N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995). Next, we consider the statutory scheme's broader structure, which suggests an absence of broad preemptive intent. Then, we consider the purposes of the statutory scheme, which are far narrower than the government contends. All told, nothing about the statutory scheme suggests a clear intent to preempt state insolvency law sufficient to overcome the presumption against preemption.

The text of the statutory scheme is silent regarding creditor priority during insurer insolvency. No section of the ACA, which spans thousands of pages, relates to insurer liquidation. Most importantly, there are no provisions addressing the order in which creditors are paid during insolvency. In fact, the ACA does not mention the words "creditor" or "debtor" anywhere in its tomes. Although the statute does contain the words "credit," "debt," "estate," "claims," "priority" and "insolvency," they are used in unrelated contexts. *See, e.g.*, 26 U.S.C. §§ 38 (discussing tax "credit"), 1401(b)(2) (discussing taxation and mentioning "estate"); 42 U.S.C. §§ 1320d-2(j)(4)(D)(ii) (making penalties for failing to comply with certain standards of a past due "debt," including by allowing the Internal Revenue Service authority to offset under 26 U.S.C. § 6402), 18002(c) (discussing submission of "claims" for reimbursement)*,* 18042(b)(2)(A)(ii) (discussing "priority" for choosing who receives certain loans); *see also* ACA sec. 10103, § 1254, 124 Stat. at 895–96 (requiring study of large group market, including evaluation of risk of insurers becoming "insolvent" due to the ACA). Likewise, the ACA does not contain any provision that addresses exceptions to the priority framework during insolvency. There is nothing in the ACA approaching an offset statute like Colo. Rev Stat. § 10-2-529.

The government relies on two inapposite ACA provisions: 42 U.S.C. §§ 18041(d) and 18063(c). Section 18041(d), by its terms, does not address insurer insolvency:

> Nothing in [title I] shall be construed to preempt any State law that does not prevent the application of the provisions of th[at] title.

If anything, § 18041(d) expresses congressional intent to preempt only a narrow class of state laws. *See Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 947 (2016) (characterizing § 18041(d) as an "anti-pre-emption provision"); *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022 (8th Cir. 2015) ("This preemption clause is a narrow one."); *Unum Life Ins. Co. of Am. v. District of Columbia*, 238 A.3d 222, 227 (D.C. 2020) (noting § 18041(d) "could be called an express nonpreemption provision"). It does not, therefore, provide evidence of a clear intent to preempt state law fixing creditor priority during bankruptcy. Likewise, § 18063(c) says nothing about insolvency:

> A health plan or a health insurance issuer is described in this subsection if such health plan or health insurance issuer provides coverage in the individual or small group market within the State. This subsection shall not apply to a grandfathered health plan or the issuer of a grandfathered health plan with respect to that plan.

Section 18063(c) merely defines the scope of insurers subject to the risk adjustment program. *See* 42 U.S.C. § 18063(a). Conway concedes that Colorado Health owes HHS a risk adjustment debt and, thus, is subject to the risk adjustment framework. Section 18063(c) does not speak to the crux of this appeal: whether the government can leapfrog other insolvency creditors when seeking repayment for a debt under the ACA. That is, § 18063(c) is simply silent on the relevant point.

The broader statutory structure, like its text, suggests an absence of clear preemptive intent. Repeatedly, Congress identified the ACA's impact on state law. *See, e.g.*, 42 U.S.C. § 18041(d) (limiting impact of title I). Specifically, it preserved some state insurer solvency law. *Id.* §§ 18001(g)(5) (preserving state solvency law when creating immediate relief for uninsured individuals with a preexisting condition), 18044 (requiring qualified health plans and private health plans be subject to the same solvency law). At no point, however, did Congress expressly supplant state solvency law. In fact, the ACA initially contained a provision requiring HHS to establish a federal solvency standard for the community health insurance option. ACA § 1323, 124 Stat. at 192. But the community health insurance option, along with HHS' obligation to create a federal solvency standard, was removed before the ACA became law. *Id.* § 10104(m), 124 Stat. at 902 (striking § 1323). Congress expressly addressed some aspects of the ACA's impact on state solvency law without addressing its impact on creditor priority during insolvency, providing strong evidence that Congress left state priority law intact.

Likewise, there is no clear purpose underlying the ACA that suggests congressional intent to supplant state law fixing creditor priority during insolvency. The government argues that Colorado law, by preventing offset here, inhibits the purposes of the 3Rs. It claims that forbidding offset "would require HHS to siphon funds from insurers that are still providing health coverage and instead direct them to insurers that have failed—unsettling markets and compounding losses across the insurance industry." Appellant Br. at 22. According to the government, Conway's "interpretation . . . would undermine the central purpose of the risk adjustment program, which is to stabilize the insurance markets in each State." Appellant Reply Br. at 5. These arguments are unpersuasive.

Fundamentally, the government overstates the statutory scheme's purposes. Though the ACA was aimed at

achieving broad purposes, like premium stabilization, there is no indication these purposes are meant to apply "at all costs." *Cf. Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 222 (1983) (holding "that the promotion of nuclear power is not to be accomplished 'at all costs'"). Most poignantly, Congress expressed an intent to only preempt a narrow class of state laws. *See* 42 U.S.C. § 18041(d). The government, on the other hand, would place any debt incurred under the ACA beyond the reach of state insolvency law. No evidence has been presented that establishes congressional intent for such expansive preemption. Ultimately, the ACA was aimed at expanding quality health care in the individual insurance market, *King*, 576 U.S. at 478–79, not supplanting traditional state regulation of insurer insolvency.

Likewise, the purposes underlying the risk-mitigation programs, the 3Rs, do not evidence a clear and manifest intent to preempt state law. Most broadly, the 3Rs were aimed at stabilizing premiums. *2014 Final Rule*, 78 Fed. Reg. at 15,411. Nothing about that purpose speaks directly to insurer insolvency. And the government has not pointed to evidence that purpose was to apply at all costs, for example to the detriment of policyholders' claims during insurer insolvency. *See* Colo. Rev. Stat. § 10-3-541 (only placing administrative expenses and policyholders' claims before debts owed to the federal government for creditor priority). For the risk adjustment program more specifically, according to HHS promulgations, that program was "intended to provide increased payments to health insurance issuers that attract higher-risk populations, such as those with chronic conditions, and reduce the incentives for issuers to avoid higher-risk enrollees." *2014 Final Rule*, 78 Fed. Reg. at 15,411. The government has not pointed to any legislative or regulatory history that suggests risk adjustment's purposes were to apply at all costs or to the detriment of state insolvency law. And the reinsurance program, according to HHS, "[wa]s designed to protect

against issuers' potential perceived need to raise premiums due to the implementation of the 2014 market reform rules, specifically, guaranteed availability." *Id.* at 15,467. Again, the government has not identified anything about that purpose that speaks to state insolvency law or any legislative history that suggests reinsurance's purposes were intended to supplant state insolvency law.

Indeed, although it is not conclusive, there is evidence that Colorado's priority framework is consistent with the ACA's ultimate goals. *Cf. Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987) (holding that sharing an "ultimate goal" with federal law "is not enough" for state law to avoid preemption). Other than administrative expenses, Colorado's priority structure only places policyholder-creditors over the federal government. Colo. Rev. Stat. § 10-3-541(a)–(c). Prioritizing policyholder-creditors increases the likelihood individuals will receive payment on their claims. This suggests the Colorado General Assembly had a policy goal promoting the claims of insured individuals above other debts. And that policy would be consistent with the ACA's policy goals. *King v. Burwell*, 576 U.S. at 478–79 (Congress adopted "a series of interlocking reforms designed to expand coverage in the individual health insurance market.").

In fact, the ACA resembles the Atomic Energy Act of 1954, 42 U.S.C. § 2011 *et seq.*, which the Supreme Court addressed in *Pacific Gas & Electric Co.*, 461 U.S. at 220–23. The Court considered whether that Act preempted two California statutes. One of those statutes, Cal. Pub. Res. Code § 25524.2, "impose[d] a moratorium on the certification of new nuclear plants" until an adequate means for disposal of high-level nuclear waste was confirmed. *Pac. Gas & Elec. Co.*, 461 U.S. at 198. PG&E claimed that "§ 25524.2 frustrate[d] the Atomic Energy Act's purpose to develop the commercial use of nuclear power." *Id.* at 220. But the Supreme Court disagreed. Although acknowledging the promotion of nuclear power was the federal act's

chief purpose, the Supreme Court held that purpose "is not to be accomplished 'at all costs.'" *Id.* at 222. The Atomic Energy Act's "elaborate licensing and safety provisions" and "preservation of state regulation in traditional areas" prevented any such reading. *Id.* Since "Congress has left sufficient authority in the states to allow the development of nuclear power to be slowed or even stopped for economic reasons," the Court held that "it is for Congress to rethink the division of regulatory authority in light of its possible exercise by the states to undercut a federal objective." *Id.* at 223.

Analogously, the government claims the statutory scheme's general purposes preempt Colorado law that fixes creditor priority during insolvency. But Congress has "left sufficient authority in the states" to regulate insolvent insurers, as evidenced by the broader structure of the statutory scheme. Nothing in the purposes of the ACA shows a "clear and manifest" intent to preempt state creditor priority law.

The ACA is silent regarding its effect on state law fixing creditor priority during insolvency. That silence stands in stark contrast to other federal provisions addressing creditor priority. *See, e.*g., 31 U.S.C. § 3713 (assigning the government's super priority during insolvency[5]); 11 U.S.C. §§ 507, 553 (fixing creditor priority during bankruptcy and establishing an offset provision). Combined with the presumption against preemption, Congress' silence "is powerful evidence that Congress did not intend" to preempt state law fixing creditors' rights during insolvency. *See Wyeth*, 555 U.S. at 575.

---

[5]    Unlike the ACA, however, § 3713 does not relate to the business of insurance. *See U.S. Dept. of the Treasury v. Fabe*, 508 U.S. 491, 501 (1993) (noting parties' agreement on that point).

3

Continuing our analysis of preemptive intent, we turn to the HHS regulations. We start with the text of the regulatory scheme. We also look to the broader regulatory structure for evidence of HHS' intent, which strongly suggests an intent to leave state insolvency law undisturbed. Finally, we consider the purposes of the regulatory scheme, which are circumscribed. Like the statutory scheme, nothing in the regulatory scheme suggests a clear intent to preempt state law setting creditor priority during insolvency.

Nothing in the text of HHS' regulations governs creditor priority or offset during insurer insolvency. *See* 45 C.F.R. subch. B. At no point does HHS place government debts, or any other debts, outside the state-fixed creditor priority scheme. Nor is there any HHS regulation that creates an exception to state priority frameworks. More specifically, there is no HHS regulation that discusses offset during insolvency. To be sure, the Netting Regulation does relate to countervailing obligations:

> HHS may net payments owed to issuers and their affiliates operating under the same tax identification number against amounts due to the Federal or State governments from the issuers and their affiliates under the same taxpayer identification number for . . . risk adjustment [and] reinsurance . . . payments and charges.

45 C.F.R. § 156.1215(b). But it says nothing about insolvency or creditor priority. The words "priority," "offset," "insolvency," and "liquidation" are notably absent. HHS did not, even implicitly, place the government's debts above those of an ordinary creditor during insolvency. Instead, the Netting Regulation refers to netting of payments without regard for creditor priority. Ultimately, the Netting Regulation is silent on the relevant point.

Indeed, the parties agree the Netting Regulation is silent regarding insolvency, even if they disagree about the implications of that silence. The government argues that insolvent insurers are subject to netting because "neither the ACA nor the Netting Regulation exempts insolvent insurers." Appellant Reply Br. at 6. That is, the government argues the Netting Regulation's general rule, which admittedly does not address state insolvency proceedings, supplants state law. Conway, on the other hand, argues HHS lacked authority to offset in liquidation because "the netting rule does not purport to" allow such offsets. Appellee Br. at 34. Again, Conway effectively asserts the regulatory scheme is silent, and that silence is strong evidence militating against a clear intent to preempt state law. *See Wyeth*, 555 U.S. at 575. That silence undermines any "clear and manifest" intent to preempt state law and, thus, undermines the presence of any preemptive intent. *See id.*

Beyond the text of the Netting Regulation, the broader regulatory scheme evidences an absence of clear preemptive intent. For example, in its data validation regulation, HHS suggests state law controls. That regulation defines "liquidation":

> For purposes of this paragraph (g)(3), liquidation means that a State court has issued an order of liquidation for the issuer that fixes the rights and liabilities of the issuer and its creditors, policyholders, shareholders, members, and all other persons of interest.

45 C.F.R. § 153.630(g)(3)(iii). If a "State court . . . order" fixes creditors' rights, then the implication is state insolvency law ordinarily defines those rights. *See, e.g.*, Colo. Rev. Stat. § 10-3-517 ("Upon issuance of [a liquidation] order, the rights and liabilities of any such insurer and of its creditors, policyholders, shareholders, members, and all other persons interested in its estate shall become fixed."). And the government concedes HHS is a "creditor" in the

relevant sense. *See, e.g.*, Appellant Reply Br. at 1 ("CMS is also a creditor of the estate."). This is strong evidence HHS understood that state law would control creditor priority during insolvency, belying any clear and manifest intent to preempt state law.

As another example, HHS preserved state insolvency law for repayment of CO-OP program loans. Congress delegated HHS authority to promulgate regulations regarding loan repayment "in a manner that is consistent with State solvency regulations and other similar State laws that may apply." 42 U.S.C. § 18042(b)(3); *see also* 45 C.F.R. § 156.520(b). By requiring consistency with state priority law, Congress preserved state creditor priority statutes. In fact, Colorado Health's loan documents recognize Congress' intent, subordinating "any HHS claim for repayment of the [CO-OP] loan amounts . . . to the claims of policyholders and other claimants." J.A. 36. But nowhere in HHS' regulations did it expressly preempt state insolvency law, even on unrelated points. HHS' explicit treatment of state solvency law is only aimed at preserving that state law from preemption, and that too undermines any clear and manifest intent to preempt state law fixing creditor priority.

Likewise, nothing about the purposes of the Netting Regulation, or any other HHS regulation, provide a clear and manifest intent to supplant state law fixing creditor priority during insolvency. The government argues "[n]etting enabled HHS to accelerate the distribution of payments to insurers and thus advanced the ACA's purpose of stabilizing the insurance markets." Appellant Br. at 1; *accord* Appellant Reply Br. at 1. And it argues that disallowing offset would undermine the "purpose of the (permanent) risk adjustment program by enabling defunct insurers to siphon off funds that are needed to pay insurers still operating, thus jeopardizing the financial stability of the functional insurers." Appellant Reply Br. at 2; *accord id.* at 1, 5–6; Appellant Br. at 22. This is particularly problematic, the government argues, because the 3Rs are

budget neutral.  Appellant Br. 20–22.  Based on those purposes, the government argues the Netting Regulation must preempt state law.

But that conclusion does not follow.  As with the ACA, the government overstates the purposes of the Netting Regulation.  There is no evidence that the Netting Regulation is anything more than an administrative payment convenience.  It does not use the terms typically found in statutes that create a substantive right, like "offset" or "set-off."  *See, e.g.*, Colo. Rev. Stat. § 10-3-529.  Nor is it paired with a priority-setting statute, like substantive offset provisions codified in state law.  *See, e.g.*, *id.* §§ 10-3-529 (set-off), 10-3-541 (priority).  Indeed, HHS itself recognized the narrow purpose of the Netting Regulation.  That regulation was designed "[t]o streamline payment and charge flows from all of" ACA programs.  *2015 Final Rule*, 79 Fed. Reg. at 13,817.  HHS hoped, by promulgating the Netting Regulation, it would be able "to operate a monthly payment cycle that will be efficient for both issuers and HHS."  *Id.*  Nothing about those purposes suggests the Netting Regulation was meant to affect creditor priority during insolvency.  Nor do they suggest the Netting Regulation was intended to preserve budget neutrality.  That regulation creates a mere payment convenience, without giving the government priority over policyholders during insolvency.  Therefore, the Netting Regulation is identical to the same right of every creditor to offset.  It allows netting for convenience purposes only, reducing the administrative burden of the voluminous transactions involved in administering the 3Rs.  Given the presumption against preemption, especially when state law has traditionally played a role in govern insolvency, the government has not shown that HHS promulgated the Netting Regulation to upset the traditional balance between the state and federal systems in this space.

Given this parallel, *Cook County National Bank v. United States*, 107 U.S. 445 (1883), is particularly on point.

There, the Court held that the federal super-priority statute (§ 3466 at the time) did not apply. *Id.* at 450. As an ordinary creditor, then, the government was not entitled to offset once the bank in question became insolvent. *Id.* at 452–53 (citing *Sawyer v. Hoag*, 84 U.S. 610, 622 (1873)). Analogously, the Netting Regulation does not promote the government to super-priority status. Like any other creditor, therefore, the government lacks a right to offset in Colorado state court during insolvency proceedings.

In sum, the regulatory scheme—just like the statutory scheme on which it depends—is silent regarding state law that fixes creditor priority during insolvency. And that silence is notable, given HHS' recognition of other issues surrounding insolvency. *See, e.g.*, 45 C.F.R. § 153.630(g) (excluding liquidators from certain reporting requirements necessary to administer the risk adjustment program). That silence, combined with the presumption against preemption, "is powerful evidence that [HHS] did not intend" to preempt state law fixing creditors' rights during insolvency. *See Wyeth*, 555 U.S. at 575.

4

To "discern Congress' intent," we have "examine[d] the explicit statutory [and regulatory] language and the structure and purpose of the" federal scheme. *Ingersoll-Rand Co.*, 498 U.S. at 138. The text is silent, providing powerful evidence of an absence of preemptive intent; the structure suggests state law will control; and the purposes do not evidence a preemptive intent absent from the text and structure of the federal scheme. Collectively, the federal scheme does not evidence a "clear and manifest" intent to preempt Colorado law fixing creditors' rights during insolvency. *Medtronic*, 518 U.S. at 485. Therefore, applying the presumption against preemption, we hold the federal scheme does not preempt Colorado's creditor priority framework. Notably, because we hold that HHS did not promulgate a regulation that preempts state law fixing creditor priority

during insolvency, we need not decide whether HHS has authority to promulgate such a regulation.

That holding is consistent with other circuits' interpretations of the federal scheme's preemptive effect. While other circuits have held that the ACA preempts state law, each of those cases involved a clear textual conflict. *UnitedHealthcare of N.Y., Inc. v. Lacewell*, 967 F.3d 82, 91–96 (2d Cir. 2020); *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016 (8th Cir. 2015); *Coons v. Lew*, 762 F.3d 891 (9th Cir. 2014). Here, as detailed, there is no such conflict. Also, those cases involved substantive issues underpinning the ACA's objectives, like the methodology used to calculate risk adjustment payments. *See UnitedHealthcare*, 967 F.3d at 91–96. In this case, the Netting Regulation is directed to an ancillary issue, payment convenience. Thus, those cases are distinguishable.

## II.  Federal Common Law

In the alternative, the government asserts that federal common law affords it a right to offset ACA debts during insurer insolvency. But the Supreme Court has never suggested the government has a common-law right to offset broader than that of an ordinary creditor. Instead, "the government has ***the same right*** which belongs to every creditor" to offset. *United States v. Munsey Trust Co.*, 332 U.S. 234, 239 (1947) (emphasis added). In Colorado, an ordinary creditor would not be permitted to offset noncontractual debts. *See supra* § A. And the government's right to offset is generally subject to state priority schemes, as a matter of federal common law, absent a statute to the contrary. *See, e.g.*, *Cook Cty. Nat. Bank*, 107 U.S. at 445; *cf. United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 740 (1979). So the government's right to offset is likewise limited.

And we will not create a new rule of federal common law that would allow HHS to offset. Even when federal common law controls, "[i]t does not follow, . . . that the

content of such a rule must be wholly the product of a federal court's own devising." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991). Often, "the prudent course is to adopt the readymade body of state law as the federal rule of decision until Congress strikes a different accommodation." *Kimbell Foods*, 440 U.S. at 740. For the same reasons that the ACA does not preempt Colorado insolvency law, the government has not shown a "significant conflict between an identifiable federal policy or interest and the operation of state law." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988); *see supra* § B.I. Thus, there is no reason to invoke federal common law to override Colorado's liquidation priority scheme. *See supra* § A.

## III. Other Federal Statutes

Without a right of offset and facing state law that survives preemption, the government is left to argue that the Claims Court's money judgment was improper. It does so in a two-pronged attack.

First, the government argues two provisions of the Tucker Act, 28 U.S.C. §§ 1503 and 2508, preclude any money judgment. Though not framed as such, the government essentially looks to those provisions for a right to offset that it could not find in either Colorado law or federal law. *See, e.g.*, Appellant Br. at 31 ("The Supreme Court and this Court's predecessor have recognized that these statutes impose a mandatory duty to give effect to the government's offsets."). But the Tucker Act does not create substantive rights. *Cf. United States v. Testan*, 424 U.S. 392, 398 (1976) ("The Tucker Act, of course, is itself only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages."). Congress merely required that the Claims Court "hear and determine" offset demands:

> Upon the trial of any suit in the United States Court of Federal Claims in which any setoff, counterclaim, claim for damages, or other demand is set up on the

> part of the United States against any plaintiff making claim against the United States in said court, the court shall hear and determine such claim or demand both for and against the United States and plaintiff.
>
> If upon the whole case it finds that the plaintiff is indebted to the United States it shall render judgment to that effect, and such judgment shall be final and reviewable.

28 U.S.C. § 2508; *see also id.* § 1503 (conferring jurisdiction over setoff claims). Here, the Claims Court "hear[d]" the government's offset demand and "determine[d]" it was not meritorious because neither state nor federal law affords the government a right to offset. In doing so, the Claims Court fulfilled its § 2508 obligations.

Second, the government argues any judgment would be futile under 31 U.S.C. § 3728:

> The Secretary of the Treasury shall withhold paying that part of a judgment against the United States Government presented to the Secretary that is equal to a debt the plaintiff owes the Government.

*See also Greene v. United States*, 124 Fed. Cl. 636 (2015) (noting, in dicta, futility under § 3728 supported not awarding a money judgment). But that argument is self-defeating. By its terms, § 3728 only applies if "a judgment" has been entered. It may prevent Conway from enforcing his judgment against the government, and we do not reach that issue here. But § 3728 does not prevent the Claims Court from entering judgment.

## CONCLUSION

For the foregoing reasons, we hold that the government did not have a right to offset ACA obligations during Colorado Health's insolvency proceedings and that the Claims Court's money judgment was proper.

## AFFIRMED

COSTS

Costs to Conway.